# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **MOHAMMED JABER,** | ) | **Case No. 18-00216-TOM-13** |
| | ) | |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| **LOAY EBAYYAH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **A.P. No. 18-00052-TOM** |
| **vs.** | ) | |
| | ) | |
| **MOHAMMED JABER,** | ) | |
| | ) | |
| Defendant. | ) | |

_____

## <u>MEMORANDUM OPINION AND ORDER</u>

This bankruptcy case and adversary proceeding came before the Court on March 12, 2019 for a trial on the Objection to Claim of Loay Ebayyah filed by the Debtor, Mohammed Jaber; and on the Amended Complaint[1] filed by Loay Ebayyah, the Plaintiff.[2]  Appearing before the Court were Michael V. Rasmussen, attorney for Loay Ebayyah; Alan B. Lasseter and C. Taylor Crockett, attorneys for Mohammed Jaber; Mohammed Jaber, Debtor; Loay Ebayyah, Plaintiff; and Mohamaud Al-Najjar and Gaines Thomas, witnesses.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) and the District Court's General Order of Reference Dated July 16, 1984, as Amended July 17, 1984.[3]  This is a core proceeding arising  under Title 11 of the

---

[1] In the complaint filed by the Plaintiff against the Debtor in the Circuit Court of Jefferson County, Alabama, the Plaintiff apparently made a jury demand.  The state court complaint was attached to the Plaintiff's initial "Complaint, Objection to Discharge & Motion" filed in this adversary proceeding.  At the beginning of the trial, this Court advised the Plaintiff that to the extent he demanded trial by jury, the demand was being stricken since he is not entitled to a jury trial under Bankruptcy Code § 523.

[2] Counsel for Plaintiff filed other pleadings in the main bankruptcy case regarding the debt, but all seem to request the same relief - that the debt to him by the Debtor be determined non-dischargeable.

[3] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District

United States Code as defined in 28 U.S.C. § 157(b)(2)(B) and (I).[4] This Court has considered the

pleadings, arguments of counsel, the testimony, and the law, and finds and concludes as follows:[5]

## **FINDINGS OF FACT**[6]

Mohammed Jaber filed his Chapter 13 bankruptcy case on January 19, 2018. Jaber has

proposed a Chapter 13 plan to pay his debts. While the plan has not yet been confirmed, some

limited claims are being paid by the Chapter 13 Trustee per Court order.[7] The claims filed include

a small mortgage arrearage,[8] two vehicles,[9] some business-related obligations, and the debt

asserted by the Plaintiff in this adversary proceeding. The Plaintiff commenced this adversary

proceeding on February 13, 2018, shortly after the bankruptcy case was filed.

At the trial both the Plaintiff, Loay Ebayyah ("Ebayyah") and the Debtor, Mohammed

Jaber ("Jaber") provided testimony regarding their agreement for Ebayyah to purchase an interest

in a business owned by Jaber. Ebayyah testified that he is a mechanical engineer who had worked

as a contractor with the United States Army in Kuwait. In 2014 he came to the United States as

an investor with $800,000. He explained that, because of the type of visa he had, he needed to

---

Court for the Northern District of Alabama provides:

> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[4] 28 U.S.C. §157(b)(2)(B) provides as follows:

> (b)(2) Core proceedings include, but are not limited to–
> . . . .
>   (B) allowance or disallowance of claims against the estate . . . ;
> . . .
>   (I) determinations as to the dischargeability of particular debts;
>   (J) objections to discharges[.]

[5] This Memorandum Opinion and Order constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[6] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

[7] *See* BK Doc. 79.

[8] Although the mortgage arrearage is small, the mortgage itself is in excess of $400,000. The Debtor is to pay the continuing monthly mortgage payments direct to the mortgage company. *See* BK Doc. 89.

[9] Claims have been filed for a 2014 Porsche Cayenne and a 2017 Toyota Tundra.

find a business to invest in. "Samir" told him about Shark's Fish and Chicken (the "Woodlawn Restaurant" or the "Business") owned by Jaber and located in the Woodlawn area of Birmingham.

Ebayyah testified that he met first with "Jabali," the manager of the Woodlawn Restaurant, then began having conversations with Jaber about purchasing it. Ebayyah explained that during the time that he was considering the purchase he would go into the Woodlawn Restaurant for "a long time" where he would observe the operations. According to Ebayyah, he had a meeting with Jaber and others in a restaurant owned by Jaber in Bessemer to discuss Ebayyah purchasing the entire Woodlawn Restaurant for $300,000, and they made an oral agreement to that effect. Ebayyah testified that he could not remember exactly when the meeting took place, but he believed the meeting and the oral agreement took place in late 2014 and/or early 2015.[10] He admitted that he neither asked for nor reviewed any documents relating to the Woodlawn Restaurant such as tax returns, profit and loss statements, or records filed with the Alabama Secretary of State, nor did he ask an attorney or an accountant for assistance before deciding to purchase the Business.

Ebayyah's testimony is not clear as to when he claims he took over the Wodlawn Restaurant. He stated that, although he was present at the Woodlawn Restaurant in December 2014 and January 2015, he did not run it at that time but instead "just sat there." According to Ebayyah, he had no experience with the restaurant business when he came to the United States, and as part of his deal to purchase the Woodlawn Restaurant, Jaber was to help Ebayyah with the business operations. Ebayyah stated that when he was considering purchasing the Woodlawn Restaurant, he asked Jabali to remain there as manager; however, Jabali had left the business before Ebayyah took over. It was unclear from Ebayyah's testimony whether Jaber had fired Jabali or if Jabali had quit. According to Ebayyah, two other employees left the Woodlawn Restaurant in

---

[10] It was unclear from Ebayyah's testimony whether the meeting and the oral agreement both took place in December 2014, or if the meeting took place in December 2014 and the oral agreement in January 2015.

3

December 2014 and January 2015. He claimed that the employees had stolen from the cash register then quit when he called the police, but then Jaber then hired the employees to work in one of his other restaurants.

Ebayyah explained that in February 2015 "Najjar," who had worked with Jaber, came to the Woodlawn Restaurant to help him run it; he left for a period of time in June then returned in July 2015. Ebayyah testified that Jaber sent other employees to help as well, with some coming from Jaber's Tuscaloosa location. Those employees stayed in a motel during that time (to avoid commuting to and from Tuscaloosa) and, according to Ebayyah's testimony, he gave them money from the restaurant. He stated he does not know if those employees received money from anyone else.

Although he had originally planned to purchase the Woodlawn Restaurant in its entirety, Ebayyah testified that he realized he could not run the restaurant by himself and thus his deal with Jaber changed; under the new agreement, Ebayyah would purchase two-thirds of the business for $200,000 with Jaber retaining one-third.[11] Jaber and Ebayyah memorialized this agreement in an Assignment of Stock signed by both and dated May 7, 2015, regarding the shares of stock in Shark's Fish and Chicken, Inc.[12] The Assignment provides that Jaber will convey to Ebayyah 66 2/3 shares of the total 100 shares of stock in Shark's Fish and Chicken, Inc. for the sum of $200,000. The Assignment further provides that the purchase price "is due and payable immediately" and that "[t]he conveyance shall not take place unless and until payment is made and the full amount clears Assignors [sic] bank." Defendant's Ex. 4. Although Ebayyah claims

---

[11] Ebayyah was asked when the agreement changed from $300,000 for the entire restaurant to $200,000 for 2/3 of the restaurant, and he indicated it was at the time of the "contract" (the Assignment of Stock); therefore, it can be inferred that, according to Ebayyah, the deal changed around May 2015.
[12] Jaber testified that he had operated the Woodlawn Restaurant under his corporation Jude LLC. In anticipation of the sale to Ebayyah, Jaber incorporated Shark's Fish and Chicken, Inc.

4

in his trial brief that Jaber did assign to him two-thirds of the shares of Shark's Fish and Chicken LLC, and that Ebayyah did pay the entire purchase price, there is no evidence before the Court that the actual transfer of the shares took place, or that checks given from Ebayyah to Jaber in payment of the purchase price cleared the bank as required by the agreement.[13]

Ebayyah claimed that Jaber agreed to provide him with help in running the restaurant, but when he called and texted Jaber for help, most of the time Jaber would not respond. Ebayyah stated that he went to Jaber's restaurant in Tuscaloosa to talk with him, and that is when Jaber told him that the Woodlawn restaurant was not his restaurant anymore.[14] Ebayyah's counsel did not ask him at trial when the Tuscaloosa meeting took place, so the time frame in which this occurred is unclear. On November 2, 2015, Jaber's attorney sent a letter to Ebayyah in care of the Woodlawn Restaurant informing him that, because the agreement between the two parties provided that Ebayyah would not receive shares in Shark's Fish and Chicken, Inc. until payment was made, and Ebayyah had not paid in full, Jaber had decided to retain all of the shares and to demand that Ebayyah vacate the Woodlawn Restaurant premises. *See* Plaintiff's Ex. 6. Ebayyah testified that he had not received the letter because he was no longer at the Woodlawn Restaurant at that time since Jaber had already informed him they were no longer partners. According to Ebayyah, he, Jaber, and others met at Ebayyah's home in Hoover, with someone acting as a mediator, in an effort to resolve the parties' dispute.[15] Ebayyah did not allege that the parties

---

[13] As discussed later in this Memorandum Opinion and Order, Ebayyah gave Jaber four checks in the amount of $40,000 toward the purchase price, and that not all of the checks were negotiated. Ebayyah and Jaber gave competing testimony regarding why checks that Ebayyah gave to Jaber were never negotiated, and neither party's testimony is more credible than the other. However, the Court is left with the question of, if Ebayyah believed that he paid the purchase price in full by giving Jaber checks in the total amount of the purchase price, why did Ebayyah nonetheless proceed to pay Jaber $100,000 in cash?

[14] In Ebayyah's Amended Complaint he alleged that Jaber, in late August 2015, sent an associate to the Woodlawn Restaurant to tell him to leave the premises. The trip to Tuscaloosa was apparently made after that per the Amended Complaint.

[15] It is unclear from Ebayyah's testimony when this meeting took place. Ebayyah attempted to introduce into evidence a purported recording of the meeting and transcript. Jaber's counsel objected on several grounds, including that the

5

reached any agreement at the meeting.

The amount of money that Ebayyah ultimately paid Jaber is not in dispute. Ebayyah introduced into evidence copies of the fronts of three checks made to Sharks Fish & Chicken, each dated January 22, 2015, and each in the amount of $5,700. *See* Plaintiff's Ex. 3. Ebayyah explained that the checks were written at Jaber's direction for expenses. According to his testimony, Ebayyah did not pay Jaber anything during January or February 2015. Ebayyah testified he gave Jaber a check dated March 15, 2015, for $40,000, which was negotiated March 16, 2015. *See* Plaintiff's Ex. 3 at 4.

According to Ebayyah, he gave Jaber four more checks dated May 7, 2015, in the amount of $40,000 each. *See* Defendant's Ex. 16. Jaber negotiated one of the May 7 checks on August 20, 2015 but did not negotiate the remaining checks at all. *See* Plaintiff's Ex. 3 at 5; Defendant's Ex. 16. It is Ebayyah's position that Jaber did not want to cash the checks because of an issue Jaber had with the IRS. He stated that Jaber did not want to be paid all at once, but instead wanted Ebayyah to pay in cash, in small increments. Jaber contended that he did not negotiate the checks because Ebayyah represented to him that they would not clear the bank. Ebayyah and Jaber stipulated that Jaber received from Ebayyah $100,000 in cash and $80,000 from the two negotiated checks, for a total of $180,000.[16]

Ebayyah testified that he received money from the Woodlawn Restaurant for only one or two months, and that he had no information as to whether or not Jaber received any money from the Woodlawn Restaurant after Ebayyah became involved.

Jaber testified that he owns or operates other Shark's Fish and Chicken restaurants in the

---

recording and transcript were in Arabic. This Court sustained the objection.

[16] The parties also agreed that Ebayyah paid Jaber a total of $17,100 (in three separate checks dated January 22, 2015, in the amount of $5,700 each) for business "expenses" around the time Ebayyah first became involved with the Woodlawn Restaurant. *See* Plaintiff's Ex. 3 at 1-3.

6

Birmingham and Tuscaloosa area, but the only location he works in is the Tuscaloosa location. Jaber's account of the Woodlawn Restaurant transaction differed in several respects from that of Ebayyah's. Jaber testified that he received a call from Jabali in November 2014 advising him that someone was interested in buying the Woodlawn Restaurant; that he, Ebayyah, and others met in December 2014 about the potential sale; and that he and Ebayyah reached an agreement for Ebayyah to purchase the Woodlawn Restaurant for $300,000 are all consistent with Ebayyah's testimony. Jaber, however, stated that he gave Ebayyah control of the business in December 2014. Jaber contended that after Ebayyah had taken over the Woodlawn Restaurant some of the expenses of the business were still being paid out of Jaber's accounts, and three checks of $5,700 each (totaling $17,100) were given by Ebayyah to make up the difference between the expenses paid by Jaber and the money he recouped from credit card receipts. Jaber indicated that these payments were separate from the purchase price of the Woodlawn Restaurant.

Jaber testified that Jabali, who had been working for him around five years, quit in the first week of December 2014 after Ebayyah had taken over. He claimed that other employees who had worked in the Woodlawn Restaurant for years had stayed to help Ebayyah run the store but quit about two months after Ebayyah took over. When Ebayyah asked for someone else to help him run the restaurant he sent Najjar and other employees from Tuscaloosa. Jaber claimed that he paid the bill for the employees to stay in a hotel during this time, which was around two months, and that Ebayyah paid the employees' wages at the beginning; however, he would pay the employees' wages if Ebayyah did not.

Jaber stated that after Ebayyah took over the store he did not make any payments for three months. In March 2015 he received a check in the amount of $40,000 from Ebayyah, who represented to Jaber that he was waiting on his wife to bring the rest of the money from Kuwait.

7

With regard to the May 7, 2015 Assignment of Stock that would give Ebayyah two-thirds ownership of the business for $200,000, Jaber testified that he had not wanted to sign it because Ebayyah was taking all the profits. He explained that he felt he had to sign the Assignment of Stock because Ebayyah had threatened to leave without paying the remainder of the purchase price; thus, Jaber agreed to this deal, giving Ebayyah credit for the $40,000 he had already paid. In his own testimony, Ebayyah denied that he had threatened to leave and noted that he had bought a house for $300,000 in cash in the Hoover area, which he stated would not have done had he intended to leave.

Jaber claimed that Ebayyah gave him four checks dated March 7, 2015, in the amount of $40,000 with the instruction that one check should be negotiated each month. According to Jaber, he waited until August 20, 2015 to cash the first May 7 check because Ebayyah told him he did not have the money to cover it. While Ebayyah had testified that Jaber wanted to be paid in cash due to problems with the IRS, Jaber claimed that Ebayyah wanted to pay in cash because the checks would not clear the bank.

According to Jaber, Ebayyah received profits from the Woodlawn Restaurant while he himself did not. Although his testimony was somewhat unclear, it appears that Jaber realized in October 2015 that he had not received any profits from the Woodlawn Restaurant, and this is why he did not refund any money to Ebayyah. Jaber testified that, because Ebayyah had not paid the entire purchase price, he decided to terminate the agreement and thus in November 2015 he asked his attorney to write the letter to Ebayyah informing him that Jaber would be keeping all of the shares in Shark's Fish and Chicken, Inc.

Mahmoud Ali-Najjar testified that he had been employed by Jaber around four or four and a half years, and he was "like a manager" who went to different stores. He worked mostly in

Bessemer, then in Tuscaloosa for a short time, then went to the Woodlawn Restaurant with Ebayyah where he stayed approximately four months. Najjar stated that he was at the Bessemer location when Ebayyah started looking into purchasing the Woodlawn Restaurant. According to Najjar, he went to the Woodlawn Restaurant in February 2015 to help out at Jaber's request. He testified that one week to ten days later Jaber sent about five employees from Tuscaloosa to the Woodlawn Restaurant, and those employees stayed in a motel with Jaber paying most of the bill. Najjar stated that he left the Woodlawn Restaurant in June to go back to Tuscaloosa but returned to the Woodlawn Restaurant in August because the business was going down. According to Najjar, he spoke with Ebayyah about running the store and Ebayyah seemed to have a bad attitude. Najjar claimed that when Ebayyah talked about leaving for Canada, he talked Ebayyah out of it.

Gaines Thomas testified that he is currently employed at the Woodlawn Restaurant location. He first began working with Jaber in August 2011. He explained that at the time Ebayyah came into the Woodlawn Restaurant there were two shifts: two people would work the first shift and three would work the second shift, with the numbers increasing to three and four respectively on the weekends. After Jabali left, Thomas's duties were increased and Ebayyah reduced the number of people working the second shift to two, although Thomas informed him it was not a good idea. Thomas stated that he began to feel stressed and spoke to Ebayyah about it, but Ebayyah did not seem very concerned. According to Thomas, Ebayyah began overworking him, giving him only one day off per week, and asking Thomas to run errands on his personal time without getting paid. Thomas asked for a raise and Ebayyah said he would raise it to $10 per hour; however, Thomas was already making $10 per hour. Thomas stated that he quit around the end of January or beginning of February 2015 but went back to work for Jaber in February 2015 at a different restaurant.

9

Following Jaber's bankruptcy filing, Ebayyah filed an unsecured proof of claim on February 13, 2018, in the amount of $507,500 on the basis that "Debtor fraudulently sold a majority interest in a business to the Creditor, then converted the business to himself." Claim No. 6. A "Statement of Interest" was attached to the Proof of Claim addressing the amount of the Claim:

> The Creditor incorporates herein the Amended Complaint file [sic] contemporaneously. The Creditor asserts that the Debtor assured the Creditor that the business the Creditor was investing in would render a profit of $15,000 a month. The Debtor then converted the business to himself, excluding the Creditor from those profits. Creditor claims interest of Interest [sic] of $7,500 on what should have been his portion of the profits.

*Id*. On the same day that he filed the Proof of Claim, Ebayyah filed this adversary proceeding to determine the dischargeability of the debt. On February 21, 2018 Jaber filed an objection to the proof of claim on the grounds that the "[c]laim is based on a contingent, disputed and unliquidated debt that is the subject of a civil action." BK Doc. 26.

## CONCLUSIONS OF LAW

### Objection to Claim

Section 501(a) of the Bankruptcy Code provides that a creditor may file a proof of claim. 11 U.S.C. § 501(a). A filed proof of claim is deemed allowed unless a party in interest objects to it. 11 U.S.C. § 502(a). Section 502(b) of the Bankruptcy Code provides that "if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount except to the extent" that one of the nine exceptions to allowance under Section 502(b) applies. 11 U.S.C. § 502(b). In the event a proof of claim is filed in accordance with the Bankruptcy Rules, it "shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). If a party in interest objects to a claim that was filed in accordance with the Bankruptcy Rules, then the objection "must 'contain

10

some substantial factual basis to support its allegation of impropriety'" in order to "'overcome the [creditor's] prima facie case.'"  *Bagget Bros. Farm, Inc. v. Altha Farmers Coop., Inc. (In re Baggett Bros. Farm, Inc.*), 315 Fed. App'x. 840, 843 (11th Cir. 2009) (quoting *Matter of Mobile Steel Co.*, 563 F. 2d 692, 701 (5th Cir. 1977); *Matter of Multiponics, Inc.*, 622 F. 2d 709, 714 (5th Cir. 1980)).  "The objecting party has the burden of going forward with evidence supporting the objection.  Such evidence must be of probative force equal to that of the allegations contained in the proof of claim." *In re Broadband Wireless Intern. Corp.*, 295 B.R. 140, 145 (10th Cir. B.A.P. 2003) (citing *Abboud v. Abboud*, 232 B.R. 793, 796 (Bankr. N.D. Okla. 1999), *aff'd*, 237 B.R. 777 (10th Cir. B.A.P. 1999)).  Should the objecting party satisfy this burden, "the burden then shifts back to the creditor 'to prove the validity of the claim by a preponderance of the evidence.'" *Baggett Bros. Farm*, 315 Fed. App'x. at 843 (quoting 4 *Collier on Bankruptcy* ¶ 502.02[3][f] (15th ed. rev. 2007)).

In his Proof of Claim Ebayyah asserts he is owed a total $507,500, which includes alleged lost profits and interest.  Jaber objects to Ebayyah's Proof of Claim on the grounds that the debt is contingent, disputed, unliquidated, and subject to a civil action, and requests that the entire claim be disallowed.

Ebayyah and Jaber had an agreement that Ebayyah would pay $200,000 and Jaber would transfer to him a two-thirds interest in Shark's Fish and Chicken, Inc./the Woodlawn Restaurant. Per the executed Assignment of Stock, Jaber had no obligation to transfer any interest to Ebayyah until the entire purchase had been paid.  Ebayyah made payments by checks and in cash in the amount of $180,000;[17] since he did not pay the entire $200,000, Jaber's obligation to transfer the shares in the Woodlawn Restaurant was never triggered.  This, however, does not mean that Jaber

---

[17] It is undisputed that Ebayyah paid to Jaber another $17,100 but, per the parties' testimony, this amount was paid for expenses and was not intended to count toward the purchase price.

has no obligation to Ebayyah at all.  The Assignment of Stock, which provided that the entire purchase price was due and payable immediately, did not address what would happen if only a portion of the purchase price was paid.  There has been no evidence, or even any allegation, that Ebayyah intended the payments to Jaber to be a gift.  Clearly, Ebayyah made payments expecting shares in the Woodlawn Restaurant in return.  According to the evidence Ebayyah has received little, if anything, as a result of the transaction with Jaber and therefore Jaber owes a debt to Ebayyah.

Official Form 410, the form used for filing proofs of claim, directs a claimant asserting interest or other charges as part of the claim amount to "[a]ttach a statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A)."  In turn, the Rule provides that "[i]f, if addition to its principal amount, a claim includes interest, fees, expenses or other charges incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or charges shall be filed with the proof of claim."  Fed. R. Bankr. P. 3001(c)(2)(A).  In addition, the Rule sets forth potential consequences such as preclusion from later providing the information or "other appropriate relief" such as assessing reasonable attorney's fees and expenses that result from the omission.  Fed. R. Bankr. P. 3001(c)(2)(D).

In his Proof of Claim Ebayyah asserts he is owed a total of $507,500, but this Court cannot determine how he arrived at this amount.  The calculation of the amount should have been provided on a statement attached to the Proof of Claim, but the "Statement of Interest" attached to Ebayyah's Proof of Claim provides no itemization or calculations at all.  The Statement of Interest does identify $7,500 of the claim as interest on Ebayyah's "lost profits;" however, it is impossible to determine the rate Ebayyah used to calculate the interest, the period of time for which the interest is claimed, or any other information regarding how the interest was calculated.  Furthermore, no

12

contract, agreement, or other written document was attached to the Proof of Claim to indicate that the parties had any agreement for the payment of interest at all. There is no information on the Proof of Claim regarding how much profit Ebayyah contends he lost other than the vague "$15,000 a month" claimed on the Statement of Interest. Nowhere in the Statement of Interest or in the Proof of Claim itself does Ebayyah reveal the base amount of the claim exclusive of alleged profits or interest. Furthermore, Ebayyah did not prove at trial that he was entitled to lost profits or interest. At the most, Ebayyah would be entitled to a refund of the money that he paid to Jaber.

Jaber requested in his Objection to Claim that the claim be disallowed. However, he did not establish that Ebayyah is not entitled to a claim. For example, Jaber argued that Ebayyah caused the Woodlawn Restaurant to lose money. However, it is difficult to discern from the profit and loss statements[18] and other evidence before the Court how much profit, if any, that the Business lost while Ebayyah was in control, or whether Ebayyah himself was the cause of any lost profits. Even if so, Jaber advanced no theory as to why this would reduce the amount of any claim that Ebayyah has. Jaber also contended, and Ebayyah admitted, that Ebayyah had paid himself some limited amount of funds from the Woodlawn Restaurant, but there was no testimony or other evidence regarding how much Ebayyah took. Neither Ebayyah nor Jaber offered any credible evidence that Ebayyah received any additional funds from the restaurant

It is undisputed that Ebayyah paid Jaber $180,000, expecting to receive a two-thirds interest in the Woodlawn Restaurant upon paying the remainder of the $200,000 purchase price. Other

---

[18] Profit and loss statements of Jude LLC and from Shark's Fish and Chicken, Inc. were introduced into evidence by Ebayyah. The Jude LLC statements for the years 2011 through the entire year of 2014 contain income and expense information for several businesses, including the Woodlawn Restaurant, lumped together. The Jude LLC profit and loss statement for 2015, which does not include the Woodlawn Restaurant according to the testimony, shows a loss for 2015. The 2015 profit and loss statement for the Woodlawn Restaurant reflects that the business made a profit. While these profit and loss statements were introduced into evidence, it is difficult to compare the statements to determine what effect Ebayyah's control of the Woodlawn Restaurant had on profits or losses. The testimony given at trial regarding the profit and loss statements was unhelpful

13

than money Ebayyah may have taken from the business for "one or two months" there is no evidence that Ebayyah received anything in return for those payments. The parties had no agreement dictating the consequences if Ebayyah paid only a portion of the purchase price. Ebayyah asserts that he should be paid a total of $507,500, inclusive of lost profits and interest, but he did not establish that he is entitled to this amount. As a result, the Court finds that Ebayyah is entitled to a claim in the amount of $180,000 representing the undisputed amount paid to Jaber. Now that the Court has determined that Ebayyah has a claim, the Court turns to the question of whether the underlying debt is dischargeable in bankruptcy.

**Dischargeability**

Bankruptcy Code § 523 enumerates several types of debt that will be excluded from a debtor's discharge. In his Amended Complaint, Ebayyah asserts that the debt owed to him is nondischargeable pursuant to subsections (a)(2), (a)(4), and (a)(6) of § 523. Bankruptcy Code § 523(a) provides in relevant part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
> . . . .
>   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>     (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>     (B) use of a statement in writing--
>       (i) that is materially false;
>       (ii) respecting the debtor's or an insider's financial condition;
>       (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>       (iv) that the debtor caused to be made or published with intent to deceive;
>   . . . .
>   (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
>   . . . .
>   (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

14

11 U.S.C. § 523(a)(2), (4), (6). A plaintiff has the burden to prove by a preponderance of the evidence that a debt should not be discharged under each of these sections. *Grogan v. Garner*, 498 U.S. 279, 286, 11 S. Ct. 654, 659 (1991) ("[T]he preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants."). A court must strictly construe exceptions to discharge to further the Bankruptcy Code's fresh start policy. *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164-65 (11th Cir. 1995).

### 11 U.S.C. § 523(a)(2)

Under Bankruptcy Code § 523(a)(2), there are two ways ways to assert a debt is non-dischargeable; the first, § 523(a)(2)(A), addresses non-dischargeability where the debt is for money, property, or services obtained through "false pretenses, a false representation, or actual fraud," while the second, § 523(a)(2)(B), addresses a written statement concerning a debtor's financial condition that is materially false. Although Ebayyah does not specify which subsection of § 523(a)(2) he is asserting, the Court will assume it is § 523(a)(2)(A) since he did not argue or present any evidence of a written statement that he relied on concerning Jaber's financial condition.

To obtain a determination that § 523(a)(2)(A) bars a specific debt from discharge, the creditor must prove that "'(1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation.'" *Sears v. United States*, 533 Fed. App'x 941, 945 (11th Cir. 2013) (quoting *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998)).

"[A] false representation includes 'a false representation as to one's intention, such as a promise to act.'" *Tinsman v. Chaney (In re Chaney)*, 596 B.R. 385, 397 (Bankr. N.D. Ala. 2018) (Jessup, J.) (quoting *Whitcomb v. Smith (In re Smith)*, 572 B.R. 1, 15 (1st Cir. BAP 2017)). "To be actionable, 'a debtor must lack the intent to perform the future act when the promise was

15

made.'" *Chaney*, 596 B.R. at 397 (citing *Bernacchi v. Cascio (In re Cascio)*, 568 B.R. 851, 856 (Bankr. M.D. Fla. 2017)). "'However, a debtor's mere failure to perform is not sufficient evidence of scienter nor is subsequent conduct contrary to the original representation necessarily indicative of fraudulent intent.'" *Chaney*, 596 B.R. at 397 (quoting *Smith*, 572 B.R. at 16.).

Ebayyah has alleged that Jaber falsely represented that he would convey to Ebayyah an interest in the Woodlawn Restaurant, would help Ebayyah manage the restaurant, and would provide Ebayyah with two-thirds of the profits. As an initial matter, Ebayyah must prove that Jaber made the representations and that the representations were false. Per the Assignment of Stock introduced into evidence, it is clear that Jaber represented that he would convey an interest in the Woodlawn Restaurant to Ebayyah. There is no evidence before the Court to show that Jaber ever conveyed that interest. However, the representation is not "false" for purposes of § 523(a)(2)(A) unless Jaber did not intend to convey the interest at the time he made the representation, an element that Ebayyah has not proven. In fact, Jaber's execution of the Assignment of Stock reflects his intent to convey the interest to Ebayyah. As to the other misrepresentations that Ebayyah alleges, there is no evidence that Jaber made them at all.[19] Because Ebayyah has not established by a preponderance of the evidence that Jaber made false representations, his request to have the debt owed by Jaber declared non-dischargeable under § 523(a)(2) is due to be denied.[20]

**11 U.S.C. § 523(a)(4)**

In the Amended Complaint Ebayyah sought to have the debt owed by Jaber declared non-

---

[19] With regard to the allegation that Jaber agreed to help Ebayyah run the Woodlawn Restaurant, it appears to the Court that Jaber did provide help - he sent Najjar, a Tuscaloosa store manager, and other Tuscaloosa employees to work there. Ebayyah never explained what more he believed Jaber should have done.

[20] In Counts one through three of his four-count Amended Complaint, Ebayyah alleged that Jaber obtained money from Ebayyah "by fraud [sic] pretenses, false representation, and/or actual fraud" under § 523(a)(2). At the trial, Ebayyah concentrated on the false representations that Jaber allegedly made, and did not argue false pretenses or actual fraud; thus, they need not be addressed by this Court.

16

dischargeable under § 523(a)(4) "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). "'Under this section, fraud or defalcation are actionable only if the debtor was a fiduciary of the creditor; whereas, embezzlement or larceny are actionable whether or not the debtor was a fiduciary.'" *Kern v. Taylor (In re Taylor)*, 551 B.R. 506, 518 (Bankr. M.D. Ala. 2016) (Sawyer, J.) (quoting *Ford Motor Credit Co. v. Talcott (In re Talcott)*, 29 B.R. 874, 878 (Bankr. D. Kan. 1983)). "A fiduciary relationship under § 523(a)(4) requires the existence of a trust." *Taylor*, 551 B.R. at 519 (citing *Infinity Group, LLC v. Lucas (In re Lucas)*, 477 B.R. 236, 242 (Bankr. M.D. Ala. 2012). "Because the fiduciary relationship must precede the creation of the debt, so must the trust; therefore, a constructive or resulting trust serving 'as the remedy for some dereliction of duty' does not create a fiduciary relationship under § 523(a)(4)." *Taylor*, 551 B.R. at 519 (citing *Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir. 1993)).

Neither at trial nor in the Amended Complaint did Ebayyah address the elements that must be proven for a debt to be excepted from discharge under § 523(a)(4), as he never alleged at all that Jaber was a fiduciary of Ebayyah. A fiduciary relationship for purposes of § 523(a)(4) requires the existence of a trust that was created prior to the time the debt was incurred. No trust existed before the parties' Woodlawn Restaurant transaction, and the transaction itself could not have given rise to the creation of a trust for purposes of § 523(a)(4). Thus, to the extent Ebayyah sought to have the debt declared non-dischargeable under § 523(a)(4), the request is due to be denied.

### 11 U.S.C. § 523(a)(6)

According to the Eleventh Circuit:

This Court has explained that a debtor commits a "willful" injury when "he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *Kane*, 755 F.3d at 1293 (quoting *Jennings*, 670 F.3d at 1334); see also *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998) (holding that § 523(a)(6) requires the actor to intend the injury, not just the act that leads to the injury). We have determined that

"malicious" means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Jennings*, 670 F.3d at 1334 (quotation marks and citation omitted). For the purposes of § 523(a)(6), "malice can be implied." *Kane*, 755 F.3d at 1294 (internal brackets, quotation marks, and citation omitted). "Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice." *In re Ikner*, 883 F.2d 986, 991 (11th Cir. 1989).

*Monson v. Galaz (In re Monson)*, 661 Fed. App'x 675, 682-83 (11th Cir. 2016) (alterations in original).[21] *See also Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 - 64 (11th Cir. 1995). To have a debt declared nondischargeable pursuant to § 526(a)(6) a creditor must prove the injury was both willful and malicious. *Anglin v. Wallis (In re Wallis)*, AP No. 10-00010, 2011 WL 2357365, at *9 - *10 (Bankr. N.D. Ala. Mar. 31, 2011) (citing *Vickers v. Home Indemnity Co. (In re Vickers)*, 546 F.2d 1149, 1150 (5th Cir. 1977)).

In *Monson v. Galaz (In re Monson)*, a recent case before the Eleventh Circuit Court of Appeals, the creditor alleged a willful and malicious injury by the debtor. In that case, the debtor signed an agreement that he would use loan proceeds to set up an internet cafe. *Monson*, 661 Fed. App'x at 676. The agreement provided that the creditor would have a lien on the business assets, that the equipment and furniture of the business would be labeled as equipment owned by the creditor and leased to the business, that the creditor would receive a portion of profits from the business after the loan had been paid in full, and that if the business was not profitable or the agreement was terminated then "'all material assets will be liquidated and first used to pay back any unrecouped portion of the loan[.]'" *Id*. at 676-77. After the business's assets were seized in a raid, the creditor informed the debtor that the agreement was terminated, and demanded the assets be liquidated to pay off the loan. *Id*. 677. Instead of doing so, the debtor recovered the seized equipment from law enforcement which he then used to start another business. *Id*. at 677-78. After

---

[21] *Kane v. Stewart Tilghman Fox & Bianci P.A.*, 755 F.3d 1285 (11th Cir. 2014); *Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329 (11th Cir. 2015)

the debtor filed his bankruptcy case and the creditor brought an adversary proceeding, the bankruptcy court concluded that the debt was not dischargeable pursuant to § 523(a)(6) for willful and malicious injury. *Id*. at 680. The bankruptcy court determined that the debtor's conduct was willful and malicious as he "injured [the creditor's] right to recover its loan, the injury was intended, and [the debtor] was conscious of his wrongdoing." *Id*. at 681. This portion of the decision was affirmed by the district court, noting that "'[the debtor's] actions injured [the creditor] because those actions deprived [the creditor] of access to the collateral, and such injury was substantially likely to occur.'"[22] *Id*. at 682.

The Eleventh Circuit affirmed, determining that the debtor's use of the equipment to engage in another business although he knew the creditor had called the loan was a willful injury. *Id*. at 683. The debtor's conduct was also malicious as he had originally agreed to liquidate the assets to repay the loan, knew that the creditor was seeking to have the loan repaid, and moved the equipment to start a new business anyway; thus, "the injury was wrongful, without just cause, and excessive." *Id*. at 684. According to the court, "[t]he collapse of the business did not relieve [the debtor] of the contractual obligations which he entered into or give him carte blanche to make off with equipment he bought with someone else's money." *Id*. at 685.

In the case before this Court, Ebayyah and Jaber had an agreement that Ebayyah would purchase two-thirds of the Woodlawn Restaurant for $200,000. The facts in *Monson* are different from those at issue in this adversary proceeding, at least in part because the parties in *Monson* had agreed beforehand what the debtor's obligation would be if the business failed or if the parties terminated the agreement. The parties to this adversary proceeding had no agreement as to what would happen if the purchase price was not paid.

---

[22] The district court disagreed with the bankruptcy court's determination that a debtor must have engaged in tortious conduct before a debt can be non-dischargeable in bankruptcy. *Id*. at 681-82.

Case 18-00052-TOM    Doc 53    Filed 05/09/19    Entered 05/09/19 15:06:50    Desc Main
Document      Page 19 of 21

According to the evidence and testimony, Jaber decided on his own that he would terminate the agreement since Ebayyah had not paid the agreed-upon $200,000. He informed Ebayyah that he was no longer a partner in the business, and still retained the entire $180,000 that Ebayyah had paid toward the purchase price.[23] Ebayyah testified, and Jaber did not dispute, that Ebayyah, Jaber, and others met regarding the parties' disagreement; thus, Jaber knew by this point that Ebayyah was seeking something in return for his payment. When Jaber decided to take back the Woodlawn Restaurant from Ebayyah, and not to refund any money, he knew that Ebayyah would be losing both his bargained-for share in the business and his investment. Jaber's act of taking back the Business while keeping all of the interest in the Business as well as the $180,000, and thus depriving Ebayyah of access to either the Business or the money, was substantially certain to cause Ebayyah injury, and this injury was willful as defined by the Eleventh Circuit.

Though Jaber made some effort to assert that Ebayyah received profits from the Woodlawn Restaurant while he himself was deprived of any alleged profits, he offered no credible evidence to prove this assertion. The only stated reason that Jaber gave for terminating the agreement was that Ebayyah had not paid the entire purchase price. Ebayyah had, however, paid most of the purchase price, and no evidence or testimony was admitted showing that Jaber made any effort to advise Ebayyah that he would take action unless the remaining $20,000 was paid; thus, Jaber made no demand for the balance of the funds or gave any notice of his intended "repossession." Furthermore, there is no evidence of an agreement between Jaber and Ebayyah that authorized Jaber to take back the Business. Given that Jaber had no agreement authorizing him to take back the business or to keep everything, that he did not make a demand for the remainder of the purchase price, and that he did not provide notice of his intentions, but nonetheless kept all of the interest in

---

[23] The total of $17,100 that Ebayyah paid to Jaber through three checks of $5,700 each is not included in the $180,000 paid toward the purchase price since the testimony reflected that the $17,100 was paid for expenses.

the Business as well as the $180,000, Jaber acted wrongly and without just cause.  As a result, the injury to Ebayyah was also malicious.  Because Jaber committed a willful and malicious injury under § 523(a)(6), the debt to Ebayyah is excepted from discharge.

**CONCLUSION**

Ebayyah and Jaber had an agreement that Ebayyah would pay $200,000 to Jaber in exchange for two-thirds interest in the ownership of the business.  Unfortunately, the parties' agreement stopped short of setting forth the consequences if the agreement did not go as planned.  Although there were allegations that Ebayyah mismanaged the restaurant and that Ebayyah did not have the money to pay the entire purchase price, these allegations are irrelevant to the question of whether Jaber owes a debt to Ebayyah, and if so, how much.    Ebayyah did not prove that Jaber acted fraudulently for purposes of § 523(a)(2)(A), or that Jaber was a fiduciary for purposes of § 523(a)(4).  Ebayyah did establish, however, that by keeping the $180,000 that Ebayyah paid toward the Woodlawn Restaurant purchase price, retaking the Business, and keeping all of the stock in the Business, Jaber willfully and maliciously injured Ebayyah pursuant to § 523(a)(6) of the Bankruptcy Code.  As a result, Jaber owes Ebayyah a non-dischargeable debt in the amount of $180,000.  It is therefore

**ORDERED, ADJUDGED, and DECREED** that Jaber's Objection to Claim is **SUSTAINED** in part.  Ebayyah's claim shall be allowed in the amount of $180,000.  It is further

**ORDERED, ADJUDGED, and DECREED** that the debt owed by Mohammed  Jaber to Loay Ebayyah in the amount of $180,000 is **NON-DISCHARGEABLE** pursuant to 11 U.S.C. § 523(a)(6).

Dated:  May 9, 2019

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM/dgm